785 F.2d 1538
 122 L.R.R.M. (BNA) 2618, 104 Lab.Cas. P 11,864
 Elbert ERKINS and Samuel Denson, Plaintiffs-Appellees,
Cross-Appellants,
v.
Billy BRYAN, Arthur Comer, George Bullard and Charlie
Greene, Defendants-Appellants, Cross-Appellees,
United States Fidelity & Guaranty Corp., Defendant-Cross-Appellee.
Elbert ERKINS and Samuel Denson, Plaintiffs-Appellees,
Cross-Appellants,
v.
Billy BRYAN, Arthur Comer, George Bullard and Charlie
Greene, Defendants-Appellants, Cross-Appellees,
U.S. Fidelity & Guaranty Corp., Defendant,
United Steelworkers of America, Defendant-Appellant, Cross-Appellee.
 Nos. 84-7455, 84-7774.
 United States Court of Appeals,
Eleventh Circuit.
 April 8, 1986.
 
 Jerome A. Cooper, Birmingham, Ala., for Bryan, et al.
 Wade K. Wright, James W. Garrett, Jr., Montgomery, Ala., for U.S. Fidelity & Guar. Corp.
 William I. Grubb, II, Eufaula, Ala., Thomas M. Jacobson, Walter F. Kelly, Milwaukee, Wis., for Erkins & Denson.
 James Brudney, Michael H. Gottesman, Washington D.C., for United Steelworkers of America.
 Appeals from the United States District Court for the Middle District of Alabama.
 Before HILL and CLARK, Circuit Judges, and MOYE*, Chief District Judge.
 CLARK, Circuit Judge:
 
 
 1
 All parties below have appealed from the district court decision in this suit for an accounting of union funds under Sec. 501 of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. Sec. 501(a), (b). Elbert Erkins and Samuel Denson, plaintiffs below, were members of Local 7326 (Local), United Steelworkers of America (USW), when the Local struck plaintiffs' employer, American Buildings Co. in Eufaula, Alabama. The strike lasted from December, 1976 until May, 1978, when employees voted to decertify USW as their bargaining representative. During the course of the strike, USW provided the Local with a strike fund of $405,000. Billy Bryan, Arthur Comer, George Bullard and Charlie Greene, defendants below, were either Local officials or prominently involved in directing picketing and other strike efforts. Together, these four individuals received $140,000 from the strike fund in payment for various expenses incurred on behalf of the Local.
 
 
 2
 Soon after the strike ended, plaintiffs challenged the propriety of these payments, especially in view of the fact that defendants had acquired significant items of personal property during and after the strike while many other union members were struggling just to meet household expenses. Plaintiffs investigated the use of strike funds by defendants and in January, 1980, they requested that USW bring suit against defendants for misapplication of union funds. When USW instead referred the case to the Department of Labor, plaintiffs sought leave to bring suit on behalf of the union in federal court. Leave was granted and suit was filed on May 1, 1980, two years after the end of the strike.
 
 
 3
 In their suit, plaintiffs sought recovery of the $140,000 in payments, either from the individual defendants or from their indemnitor, United States Fidelity and Guaranty Corporation (USF & G). In addition, plaintiffs requested an award of $305,000 in attorney's fees, payable by the defendants or intervenor, USW. After a three day non-jury trial, the district court ordered a recovery of $14,461.30 from the individual defendants, payable to USW. The court held that plaintiffs' delay in joining USF & G had discharged the indemnitor from any liability under the bond, and recovery could be had only from the individuals. In a separate order, the court awarded plaintiffs $42,000 in attorney's fees, payable by USW. 598 F.Supp. 240.
 
 
 4
 The parties present the following issues on appeal. Defendants argue that the district court erred in finding plaintiffs had standing to sue as union "members" under Sec. 501(b) of LMRDA. Defendants contend that the statutory definition of union "member" must yield to each union's definition of membership and plaintiffs would not be considered members by USW standards. Alternatively, defendants urge that this suit is time barred under recent Supreme Court precedent applying a six-month statute of limitations to cases brought under federal labor law. Intervenor USW joins in defendants' arguments and furthermore contests the order to pay $42,000 in attorney's fees. USW contends that the district court's use of the common benefit theory of fee awards is clearly at odds with the language and legislative history of Sec. 501(b), which limits fee awards to the amount of money recovered in an accounting suit (here only $14,461.30).
 
 
 5
 Plaintiffs for their part assert error in the district court's order to recover only $14,461.30. Plaintiffs contend that the district court arbitrarily approved numerous payments not properly accounted for by defendants; thus, they request a judgment for the full $140,000 paid to defendants. Furthermore, plaintiffs contend that USF & G was erroneously found discharged from the fidelity bond since USF & G did not prove prejudice from the delay in being joined as a defendant. Lastly, plaintiffs' attorneys argue that the district court erroneously awarded only 12% of their requested fee by arbitrarily reducing the number of hours billed, the hourly rate and eliminating the contingency factor.
 
 
 6
 We affirm the district court order and thus, reject all these contentions.
 
 I. Plaintiffs' Standing Under Sec. 501
 
 7
 Section 501(a) provides that "the officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is therefore, the duty of each such person ... to hold [the organization's] money and property solely for the benefit of the organization and its members." 29 U.S.C. Sec. 501(a). Section 501(b) provides that "any member of the labor organization" may sue a defaulting union officer in federal court "to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization." 29 U.S.C. Sec. 501(b). Defendants argue that plaintiffs were not members of USW at the time of suit and therefore cannot sue for an accounting. Our consideration of this issue is foreclosed by the decision of a prior panel in an interlocutory appeal in this case. See Erkins v. Bryan, 663 F.2d 1048 (11th Cir.1981) (Erkins I ). That panel held that plaintiffs were USW members at the time of filing suit and thus had standing to sue. Since findings of fact and conclusions of law by an appellate court bind all subsequent proceedings in the same case, absent exceptional circumstances, we find that plaintiffs have standing. See Westbrook v. Zant, 743 F.2d 764, 768 (11th Cir.1984).
 
 
 8
 II. Statute of Limitations for Sec. 501 Accounting
 
 
 9
 Defendants assert that the district court erred in refusing to apply the six-month statute of limitations of the National Labor Relations Act (NLRA) to the present action. Neither Sec. 501 nor the LMRDA specifically provide a period of limitations. When confronted with such legislative omissions, federal courts ordinarily adopt the most analogous state statute of limitations. An exception to this rule occurs when state law would contradict the purposes of the federal law or policy at issue; in that case, courts look to related federal statutes or doctrines. See UAW v. Hoosier Corp., 383 U.S. 696, 703-704, 86 S.Ct. 1107, 1111-1112, 16 L.Ed.2d 192 (1966). Defendants urge that the recent Supreme Court decision in DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), requires this court to apply the NLRA statute of limitations in this case.
 
 
 10
 DelCostello involved a hybrid action brought under federal labor law by a disgruntled union member against his employer for breach of the collective bargaining agreement and against the union for breach of its duty of fair representation. The suit against the employer was brought under Sec. 301 of the National Labor Relations Act, 29 U.S.C. Sec. 185. The suit against the union was brought as an unfair representation claim pursuant to 29 U.S.C. Sec. 158(b). The Supreme Court selected a federal rather than state limitation for the case based upon several considerations: the Court found no closely analogous state limitation; federal labor policy in this context required particularly prompt resolution; and the interplay of hybrid claims, one part (the unfair labor practice claim) having an extremely short express federal limitation (6 months under Sec. 10, 29 U.S.C. Sec. 160(b)), argued for a single federal limitation when combined. See 462 U.S. at 171, 103 S.Ct. at 2294. Thus, the Court applied the six-month limitation normally applicable to unfair labor practices, see 29 U.S.C. Sec. 160(b), and emphasized that such a result properly balances "the national interest in stable bargaining relationships and finality of private settlements, and an employee's interest in setting aside what he views as an unjust settlement under the collective bargaining system." 462 U.S. at 171, 103 S.Ct. at 2294 (quoting United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981)). The Supreme Court noted, however, that nothing in the DelCostello analysis should upset the traditional rule of UAW v. Hoosier, supra. See 462 U.S. at 171, 103 S.Ct. at 2294.
 
 
 11
 In this circuit, the rationale of DelCostello has been applied in two contexts other than a hybrid action, and defendants argue that these cases should control our decision here. The first such case is Erkins v. United Steelworkers, 723 F.2d 837 (11th Cir.1984) (Erkins II ), a pure breach of fair representation claim brought by the instant plaintiffs and based on the failure of the union to negotiate with the employer during the strike which spawned the present case. The Erkins II panel applied the NLRA limitation for unfair labor practices because a fair representation claim bears a close resemblance to an unfair practice and thus implicates the very balance of interests at issue in DelCostello. See 723 F.2d at 838-39.
 
 
 12
 Following Erkins II, another panel relied on DelCostello in Davis v. UAW, 765 F.2d 1510 (11th Cir.1985). Davis involved abuse of free speech rights protected by 29 U.S.C. Sec. 411(a)(2), part of the "Bill of Rights of Members of Labor Organizations." The panel noted that the DelCostello analysis did not compel the use of the NLRA limitation because free speech claims do not implicate the collective bargaining structure as do unfair practices and thus, do not require uniform limitations or expedited resolution. See 765 F.2d at 1514. Rather, the panel found that the expulsion of the plaintiffs from the union was based upon friction between the local union and the international union which threatened stable bargaining relationships between the international union and the steel industry. Referring to DelCostello, the panel opinion stated: "We believe we are bound to find a similar connection between labor peace and an action based on a union's alleged mistreatment of its members by the denial of statutorily protected rights." Id. at 1514. Further, the panel found no analogous state cause of action.
 
 
 13
 The cause of action under consideration here is quite different from those described and we conclude that the limitation period for filing a Sec. 501 action is not governed by DelCostello, Erkins II, or Davis. Plaintiffs in this lawsuit sought an accounting for union funds allegedly diverted to personal use by the individual defendants. There is no claim against a union or an employer. Consequently, neither the collective bargaining process nor stability of labor union relations is involved.[1]
 
 
 14
 Since this Sec. 501 suit is not controlled by the rationale of DelCostello and its progeny, the district court correctly declined to apply the NLRA limitation. Instead, the district court applied the federal equitable doctrine of laches and still found the suit timely filed. In so doing, the court recognized another exception to UAW v. Hoosier's suggested reliance on state statutes of limitations. Policies underlying the creation of federal equitable claims are not well served by applying rigid limitations; therefore, federal courts considering federal equitable claims should rely on equitable principles. See Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed.2d 743 (1946). Since a Sec. 501 suit for an accounting is essentially equitable in nature, see Local 92, International Association of Bridge Workers v. Norris, 383 F.2d 735, 741 (5th Cir.1967), laches is an appropriate test for timeliness. Accord Morrissey v. Curran, 482 F.Supp. 31, 40 (S.D.N.Y.1979); Yablonski v. UMW, 80 L.R.R.M. (BNA) 2594 (D.D.C.1971). The district court in turn correctly applied the doctrine, finding that plaintiffs' May 1, 1980 filing caused no undue prejudice to defendants and therefore the suit was timely filed. See EEOC v. Dresser Industries, Inc., 668 F.2d 1199 (11th Cir.1982) (laches requires unequitable delay in filing and undue prejudice to defendants).
 
 III. Misapplication of Strike Funds
 
 15
 Plaintiffs on cross-appeal assert that the district court erred in its calculation of misspent funds. They contend that defendants should remit all $140,000 paid them since the expenses or compensation claimed were never supported by records, receipts or independent corroborating testimony. Plaintiffs consider the failure to keep records a per se breach of fiduciary duty under Sec. 501.
 
 
 16
 Such a position ignores Congress' admonition that courts must "take into account the special problems and functions of a labor organization" when construing fiduciary duty under Sec. 501. See 29 U.S.C. Sec. 501(a). Imposing liability on the mere failure to keep receipts would ignore the fact that strike leaders are neither accountants nor comptrollers; their positions as union leaders demonstrate their organizational rather than financial expertise. The district court employed a more appropriate legal standard. A union official fulfills his fiduciary duty, even though he may indirectly benefit from use of union funds, whenever he can show that the funds were authorized by the union and were expended for the benefit of the union. See Ray v. Young, 753 F.2d 386 (5th Cir.1985); Morrissey v. Curran, 650 F.2d 1267 (2d Cir.1981).
 
 
 17
 The district court correctly applied this rule with regard to each category of contested payments. Plaintiffs disputed the fact that defendant strike leaders received far more than the $20 to $30 per week strike benefit paid rank and file members. The lower court found most of these payments authorized and reasonable simply because defendants spent far more time and effort promoting the strike and boycott than other union members.[2] Not only did their efforts benefit the union, they precluded defendants from working elsewhere to meet their household expenses. Conversely, the lower court disallowed a number of third party payments as unauthorized by union rules and manifestly unreasonable since such payments would not have been made to rank and file members and the union received no benefit from the payments.[3]
 
 
 18
 The trial court took a creative, but certainly not inequitable, approach in reviewing the final category of payments, those for travel expenses. These payments cannot be disallowed as a matter of law since there is no showing that defendants' trips were unauthorized. Indeed, defendants must have incurred some expense since plaintiffs failed to show that any of the trips did not take place. Personal benefit occurs only if the pre-trip expense money was not completely spent on the single trip for which it was issued. Any overage would be unauthorized and manifestly unreasonable since defendants would have been overcompensated. See Ray v. Young, supra at 392, (double reimbursement for expenses voids authorization and requires reimbursement). The trial court's use of an average time, distance and cost for each challenged trip seems an acceptable means, in the absence of specific records, of determining whether defendants were overcompensated for trip expenses. Approximation is necessary as a matter of equity where plaintiffs have failed to disprove the fact of a trip. The court's function in a Sec. 501 accounting is not to impose, through the penalty of reimbursement, specific record keeping procedures. Courts should intervene in a union's financial affairs only when authorized payments are "significantly above a fair range of reasonableness." Morrissey v. Curran, supra at 1275. Thus, we affirm the district court order to return $14,460 to the international union.
 
 IV. Attorneys' Fees
 A. Setting the Appropriate Fee
 
 19
 Plaintiffs' attorneys assert several errors by the district court in its calculation of their fee. First, they claim that unrebutted affidavits regarding hours and hourly rates were improperly ignored. Second, they claim that the court failed to increase basic fees to reflect the contingent aspects of the case, despite case law authorizing such upward adjustment. Third, they suggest that cutting the already diminished fee by an additional 60% contradicts the lower court's finding of substantial non-monetary benefits produced by this suit. Despite these arguments, we affirm the fee award of $42,000.
 
 
 20
 Section 501(b) of the LMRDA authorizes the award of reasonable attorney fees and expenses in cases such as this one.[4] The district court has properly considered plaintiffs' attorneys' request for $203,587.50 in fees, plus an enhancement of 50%, for a total of $305,381.25. Plaintiffs claim that 1,749 hours were spent on the case at an average rate of $116.40. Plaintiffs' three attorneys claimed individual hourly rates of $125 (out-of-town counsel) and $80 (local counsel). The district court relying on Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-18 (5th Cir.1974), eliminated about one-third of the hours claimed as unnecessary, duplicative or poorly documented. Next, the court selected $90 as the appropriate hourly fee since plaintiffs' affidavits listed local community rates within a range of $75 to $200. This figure is not clearly erroneous and is consistent with the dictates of Johnson, supra. Indeed, the district court merely employed a sense of "billing judgment" customarily used in private practice. See Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). Thus, the district court correctly found a starting point fee of $90,000 to $100,000.
 
 
 21
 Furthermore, the district court clearly did not err in refusing to enhance the starting point or "lodestar" fee. Plaintiffs' attorneys cite the following justification for enhancement by 50%: complex legal issues, high risk of loss, substantial time investment with low probability of compensation, important values at stake, and potentially large monetary and non-monetary benefits to USW members. The Supreme Court recently rejected such reasons for enhancement. See Blum v. Stenson, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The Stenson Court found that novelty and complexity are reflected in the number of hours expended; additional compensation is merely "double counting." 104 S.Ct. at 1549. Further, the benefits resulting from this litigation do not justify an enhancement of the starting point fee. To the contrary, the results support the district court's reduction of the fee.
 
 
 22
 We find that the district court correctly decreased the fee award from a maximum starting point of $100,000 to only $42,000. The Supreme Court has recognized that the quality of results obtained is an "important factor" in reaching a final fee amount. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.... If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." Hensley, supra at 1940-41. Plaintiffs certainly did not obtain excellent monetary results here as only 10% of the amount sought was actually obtained. Indeed, the trial court found that at most $50,000 constituted questionable payments. In undertaking any case counsel is obligated to consider the amount involved, the merits of the client's cause, and the chance of success at the outcome of the representation. Here plaintiffs sought recovery of $140,000 in the lawsuit but requested $305,000 in fees at the conclusion of the case. Fees of $300,000 or even $100,000 are inappropriate where only $14,000 is recovered. In Blum v. Stenson, supra, the Supreme Court specifically held that enhancement of a fee is permissible where there is exceptional success. As part of the same reasoning, it must be accepted that fees have to be reduced on occasion when the result was less than a success, as occurred here. The result had to have been foreseeable by counsel and they have to share some of the loss along with plaintiffs, as the converse would be true if exceptional success had been achieved. We refuse to give any credit for the contingency factor, since counsel failed to properly appraise the case at the outset. Also, in considering the level of success, we note that counsel failed to join timely defendant USF & G so that it would have been available as a defendant to contribute to a possible settlement. The district court properly considered Johnson, Hensley, and Blum, and reached an appropriate fee award.
 
 
 23
 The court's award is, moreover, consistent with prior cases under Sec. 501. See Local 92, International Association of Bridge Workers v. Norris, 383 F.2d 735 (5th Cir.1971); Highway Truck Drivers v. Cohen, 220 F.Supp. 735 (E.D.Pa.1963). Plaintiffs' counsel cite no cases in which the spread between fees and recovery are as great as that requested in this case. In fact, the award in this case is more generous than those cited above. Here, plaintiffs' counsel will receive three times the monetary recovery; in Cohen, the attorneys received half that much; and in Norris, they received less than the award itself. To the extent the fee exceeds the recovery, counsel has been compensated for the non-monetary as well as the monetary benefits produced by their efforts on plaintiffs' behalf.
 
 B. Union's Liability for Fees
 
 24
 USW, the union beneficiary of all funds recovered by plaintiffs in this suit, intervened to limit the fee award. Under the terms of the statute, the union has an opportunity to prosecute plaintiff's claim of misapplied funds. If the union declines and the claim proves meritorious nonetheless, the union may be required to pay the cost of plaintiff's efforts. USW asserts that even if plaintiffs have recovered $14,460 in union funds, the international union should not be required to pay more than that amount for plaintiffs' attorneys' fees. The district court held to the contrary, citing the former Fifth Circuit opinion in Local 92 v. Norris, 383 F.2d 735 (5th Cir.1967). Norris held that an international union could be liable for attorney fees if the misapplied funds had not yet been returned to the union. Additionally, Norris held that the fees could exceed the recovery. Under the rule of Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981), we are bound by the holding of Norris.
 
 
 25
 USW claims that recent Supreme Court rulings on attorney fee awards, principally Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), and Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), have rendered Norris non-binding precedent in this circuit. See County of Monroe, Florida v. Department of Labor, 690 F.2d 1359 (11th Cir.1982) (prior panel decision is not binding when contradicted by intervening Supreme Court precedent). Furthermore, USW argues that the holding in Norris ignores the plain language and history of the statute, which clearly limits fee awards to the amount of the recovery.
 
 
 26
 First, we cannot agree that Fleischmann and Alyeska have undermined Norris' precedential value. In both cases the Supreme Court declined to authorize an award of attorney fees when the federal statute which was the basis of the lawsuit did not authorize such an award. Fleischmann holds that where Congress has set out a detailed scheme of remedies for a statutory cause of action, courts may not expand those remedies on the basis of general equitable principles. See 87 S.Ct. at 1408-09. The remedies provided under Sec. 501 of the LMRDA do not approach the specificity of those considered in Fleischmann, an action for trademark infringement under the Lanham Act. The latter statute provides for injunction and recovery of damages, defendant's profits, and costs including fees for clerks, marshals, court reporters, witnesses, printing, copying and docket fees. See 28 U.S.C. Sec. 1920. Notably omitted is any reference to attorney fees. Section 501(b) provides that plaintiffs may sue for an accounting, damages or "other appropriate relief" and provides for an award of attorney fees. While this language is more specific than that of other sections of the LMRDA, see, e.g., 29 U.S.C. Sec. 412 (suit for "such relief (including injunctions) as may be appropriate"), it hardly sets forth the comprehensive remedies found in the Lanham Act. Furthermore, there is no evidence that Congress meant to prohibit equitable remedies under Sec. 501. On the contrary, Congress' reference to an accounting seems an affirmative invitation to rely upon equity in enforcing fiduciary duties. See Norris, 383 F.2d at 743. Thus, Fleischmann is not authority for our overruling Norris and holding that an attorney's fee may not exceed the amount of the recovery.
 
 
 27
 USW's reliance on Alyeska is similarly unpersuasive. In that case the Supreme Court held that courts may not shift attorney's fees simply to encourage private enforcement of legislation in the public interest. See id. 95 S.Ct. at 1627. If Congress has not provided expressly for fee-shifting, courts may not fill the gap by rewarding successful plaintiffs for acting as "private attorneys general."
 
 
 28
 While Alyeska may spell the end of fee-shifting in the absence of statutory authorization, it does not control the present case. First, and most obviously, Sec. 501 of the LMRDA expressly authorizes fee-shifting. Second, the Supreme Court's analysis in Alyeska focused on the private attorney general concept. See 421 U.S. at 260, 95 S.Ct. at 1623. It could not deal with the common benefit theory, the principle at issue in this case, because under the facts of Alyeska, fees could not be shifted to the direct beneficiaries of the suit.[5] Thus, the holding of Alyeska in no way impairs the holding of Norris. Indeed, fee-shifting in excess of the recovery under Sec. 501 has survived Alyeska intact. The District of Columbia Circuit, for example, has implicitly reaffirmed such fee-shifting in post-Alyeska cases. See, e.g., Usery v. Local 639, International Brotherhood of Teamsters, 543 F.2d 369 (D.C.Cir.1976) (noting that Alyeska did not impair the common benefit theory used in LMRDA cases); Monzillo v. Biller, 735 F.2d 1456 (D.C.Cir.1984).
 
 
 29
 While we affirm that Norris remains good law, we also point out that its allowance of fees in excess of judgment is fully consistent with the legislative purpose of Sec. 501. As the Supreme Court has noted, the LMRDA reflects "calculated ambiguity [and] political compromise" rather than a precise congressional directive. See Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 1949 n. 17, 36 L.Ed.2d 702 (1973) (quoting Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 852 (1960)). The better guide to statutory construction here is Congress' ultimate purpose in legislating, not its "plain language."[6] See id. The LMRDA's purpose is to impose fiduciary duties on union leaders and to remove disincentives to enforcement of those duties by union members. See Bakery Workers v. Ratner, 335 F.2d 691, 696 (D.C.Cir.1964). Strictly limiting fees to the amount recovered would frustrate that purpose. See id.
 
 
 30
 Nowhere is this realization clearer than in the courts' routine allowance of fees in suits for injunction or other non-monetary relief under LMRDA. See, e.g., Monzillo v. Biller, 735 F.2d 1456 (D.C.Cir.1984) (suit for injunction); Marshall v. United Steelworkers, 666 F.2d 845 (3d Cir.1981) (suit to overturn election results); Usery v. Local 630, International Brotherhood of Teamsters, 543 F.2d 369 (D.C.Cir.1976), (intervention in suit to overturn election results). Such fee-shifting is based on the common benefit theory, the equitable principle which requires that those who directly benefit by litigation must reimburse the successful plaintiff's costs or stand unjustly enriched. See Usery, supra at 382 (citing Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed.2d 1184 (1939)).
 
 
 31
 Since neither Supreme Court precedent nor congressional intent limit the scope of Sec. 501(b), we reject USW's contention that fee-shifting in excess of the recovery is always impermissible. Rather, we find such relief necessary to effect the equitable goals of Sec. 501. Nonetheless, fees above the recovery are not automatically shifted simply because they represent a reasonable amount under the Hensley-Stenson factors discussed at part IV A, supra. To shift the excess, the plaintiff must prove that litigation confers significant non-monetary benefits on those persons who will ultimately pay the fees. See Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). Furthermore, those fees must spread the cost proportionally among those who benefit. See Shimman v. Local 18, International Union of Operating Engineers, 744 F.2d 1226, 1235 (6th Cir.1984) (quoting Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)).
 
 
 32
 Proportionality of cost and benefit is obvious here, since the strike funds were actually provided by USW and USW would both recover them and pay the fees under the district court order. As the District of Columbia Circuit has noted, payment of fees by the union under LMRDA is a quintessential example of proportionality: there is "a close match between the party assessed and the beneficiary of the litigation." See Usery, supra at 383. Thus, we reject USW's claim that only the defunct Local will benefit from this suit. In reality, neither the Local nor the plaintiffs will realize a penny.
 
 
 33
 Substantial non-monetary benefits from the suit are less obvious, but not clearly erroneous. The district court found two. First, the suit exposed the practical flaws in USW's strike fund accounting procedures. Second, plaintiffs' ultimate recovery demonstrates that USW cannot rely on Department of Labor investigations to find fiduciary breaches in Local affairs. USW considers these benefits insubstantial because it plans no change in accounting procedures nor has the court ordered any. Thus, the so-called "benefit" would only "result [from] the realization that the union would have to reform itself or risk exposure to further liability." Shimman v. Local 18, International Union of Operating Engineers, 744 F.2d 1226, 1235 n. 13 (6th Cir.1984). USW suggests that we follow the Sixth Circuit, which has refused to shift fees in just this sort of case because the benefit, in its opinion, is no different from results achieved under the private attorney general theory.
 
 
 34
 We decline to apply Shimman to this case. Shimman's primary benefit, in the sum of $225,000, ran solely to the named plaintiff, compensating him for assault and battery and violation of his free speech rights. Any incentive for change in union policy was largely ancillary to plaintiff's personal recovery. Here, in contrast, the monetary recovery, as well as the incentive to change, directly concerns USW rather than the plaintiffs. Furthermore, we do not find such incentive an insubstantial benefit. Substantiality does not rest on compulsory reform or injunctive relief. The District of Columbia Circuit has found substantial benefits as the result of preliminary injunctions and the mere filing of suit for such an injunction. See Yablonski v. UMW, 466 F.2d 424 (D.C.Cir.1972). Compulsion was not possible in Yablonski since the merits were never reached, yet, the court found a benefit and shifted fees. Similarly, that circuit and the Third Circuit have found benefits sufficient to shift fees where the plaintiff has only intervened in a suit brought by the Secretary of Labor. See Marshall v. United Steelworkers, 666 F.2d 845 (3d Cir.1981); Usery v. Local 639, International Brotherhood of Teamsters, 543 F.2d 369 (D.C.Cir.1976). The benefits were said to be the intervenor's unique perspective on the case and the possibility he might discover new evidence or develop legal arguments for the Secretary's litigation. See Marshall, 666 F.2d at 853; Usery, 543 F.2d at 383-84. Certainly, if the intervenor's contributions constitute a benefit sufficient to shift fees, plaintiffs' impeachment of USW's strike fund accounting provides a substantial benefit to the members of USW. Thus, we affirm the district court order that USW pay $42,000 for plaintiffs' attorneys' fees.
 
 V. Liability Under the Fiduciary Bond
 
 35
 The final issue on appeal concerns the extent of recovery under USW's fiduciary bond for the defendants. Section 502 of LMRDA requires that "every officer, agent ... or other representative or employee of any labor organization ... who handles funds or other property thereof shall be bonded to provide protection against loss by reason of acts of fraud or dishonesty." 29 U.S.C. Sec. 502(a). USF & G, defendant below, had bonded the defendant officials of the Local. Although USF & G was not originally a party to this suit, plaintiffs learned of the USF & G bond about one month after the suit was filed. The bonding company was not joined as a defendant, however, until three years after filing. After a trial on the merits, the district court found that plaintiffs could not recover from USF & G because they had failed to meet the notice and claim provisions of the bonding contract.
 
 
 36
 Plaintiffs claim error in the district court's finding. They contend that rank and file union members cannot be barred from recovery for failure to comply with notice and claim provisions. See Giordani v. Hoffman, 295 F.Supp. 463 (E.D.Pa.1969); Purcell v. Keane, 277 F.Supp. 252 (E.D.Pa.1967). Although Giordani and Purcell allowed claims in spite of failure to comply with the bond provisions, those cases are not controlling here. Since the bonding companies had been joined in the original complaints in those cases, prejudicial delay was not at issue. Here, plaintiffs delayed for three years after they received actual knowledge of the bond's existence; during that time, they never inquired as to the bond's provisions. Plaintiffs claim they were distracted by the hotly contested issue of standing to sue. While distraction certainly is possible, it is no excuse for failure to diligently pursue all claims arising from the misapplication of strike funds. See United Klans v. McGovern, 621 F.2d 152 (5th Cir.1980) (once plaintiff has inquiry notice of claims, statute of limitations begins to run). Contrary to plaintiffs' assertions, prejudice to USF & G from this delay in joinder is certainly not speculative. USF & G was denied the opportunity to challenge plaintiffs' standing under Sec. 501, to argue for or against intervention by USW, and to participate in much of the discovery prior to trial. We conclude, therefore, that plaintiffs' claim against USF & G is barred for lack of due diligence. We affirm the district court's finding.
 
 
 37
 AFFIRMED.
 
 
 
 *
 Honorable Charles A. Moye, Jr., Chief U.S. District Judge for the Northern District of Georgia, sitting by designation
 
 
 [1]
 We distinguish the rulings of other circuits applying the six-month NLRA limitation on similar grounds. Local Union 1397 v. United Steelworkers, 748 F.2d 180, 184 (3d Cir.1984), concerned alleged violations of LMRDA clearly implicating labor management relations. Local Union officials had been disciplined for disagreement with international union officials about "pollution control in steel plants, collective bargaining strategy, construction of new plants, arbitration policies" as well as "internal union governance." 748 F.2d at 182. In Vallone v. Local Union 705, 755 F.2d 520 (7th Cir.1984), union members likewise brought suit under LMRDA for free speech violations occurring in connection with a dispute about modifications of the labor contract. Linder v. Berge, 739 F.2d 686 (1st Cir.1984), involved failure to provide copies of the collective bargaining agreement to union members disputing their discharge from union construction work. The link between labor-management stability and LMRDA is clear in all these cases but not in the instant case
 
 
 [2]
 For example, defendant Billy Bryan, former president of the Local, worked twelve to sixteen hours per day, five to six days a week on strike maintenance. Charlie Greene acted first as assistant and then principal treasurer for the strike fund, working three to four days each week. These men, as well as the other defendants, also made numerous trips in support of the strike and boycott
 
 
 [3]
 These third party payments included strike fund checks negotiated, for example, to pay for clothing, household goods, and auto repairs on cars not used for union business
 
 
 [4]
 29 U.S.C. Sec. 501(b) provides: "The trial judge may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation."
 
 
 [5]
 The plaintiffs in Alyeska, several environmental groups, had sought to prevent construction of the trans-Alaska pipeline by bringing suit against the Secretary of the Interior. The groups sought an injunction against issuance of permits facilitating the acquisition of land for the pipeline. See 421 U.S. at 242-45, 95 S.Ct. at 1614-15. At the close of litigation, the District of Columbia Circuit directed the pipeline company to reimburse one-half of the plaintiffs' attorneys' fees. See id. at 1616. Consequently, the cost of litigation would have been borne by the pipeline's customers but the benefits of enforcing the environmental laws at issue would have redounded to the general public
 
 
 [6]
 This response to the "plain language" argument applies equally well to USW's argument on legislative history. USW relies on the fact that from the Senate floor, prior to passage, Senator Goldwater criticized the legislation on this very point. He noted that the language of section 501 differed from that in other parts of the bill, the latter specifically authorizing fees in addition to, rather than as a portion of, the monetary recovery. See 105 Cong.Rec. 16489 (daily ed. Aug. 20, 1959) (statement of Sen. Goldwater). Senator Goldwater warned that this difference would inhibit member enforcement since the cost of litigation could exceed the fund recovered. USW concluded that since neither house amended the bill to conform section 501 with other sections, Congress intended to strictly limit fees to the amount of the recovery. While USW's research is sound, its conclusion is faulty. It is true that Congress generally acts for a reason, and often for reasons set forth in the legislative history, but we can never be sure, in the absence of an explicit statement, why Congress fails to act. Any conclusions about legislative intent drawn from the sequence of events merits the same skepticism due the plain language of the statute